947 A.2d 698

B.H., APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 16, 2008—Decided June 3, 2008.

420

Before Judges CUFF, LISA and SIMONELLI.

*David D. Gladfelter,* argued the cause for appellant (*South Jersey Legal Services, Inc.,* attorneys; *Mr. Gladfelter,* of counsel and on the brief).

*Jennifer J. Dugan,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Ms. Dugan,* on the brief).

The opinion of the court was delivered by

CUFF, P.J.A.D.

B.H. appeals from a final agency determination that she no longer qualifies for Work First New Jersey/Temporary Assistance for Needy Families (WFNJ/TANF) benefits for her family because she also receives benefits from the Subsidized Adoption Program (SAP) [1] for her two adopted children. We reverse that

---

[1] SAP is regulated by *N.J.A.C.* 10:121–1.1 to –1.7.

decision because the instruction issued by the agency governing her and similarly situated families is effectively a rule and it was not promulgated in accordance with the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15.

Appellant B.H. received benefits from the TANF segment of the WFNJ/TANF welfare program[2] under the Work First New Jersey Act (WFNJ Act). *N.J.S.A.* 44:10–55 to –70; *N.J.A.C.* 10:90–1.1 to –20.13.[3] The WFNJ/TANF program is administered at the local level by county welfare agencies pursuant to regulations and directives of the Department of Human Services (DHS), Division of Family Development (DFD). *N.J.A.C.* 10:90–1.1(g).

B.H. is a single mother with two adopted children. B.H received WFNJ/TANF benefits in the amount of $322 per month. B.H. filed a Redetermination/Recertification For Assistance application with DFD on November 21, 2005. In this application, B.H. certified that she received Social Security in the amount of $512 per month and Supplemental Security Income (SSI) in the amount of $118.25 per month. In addition, B.H. reported that she received $683.29 for her adopted daughter and $527.31 for her adopted son, a total of $1,210.60 per month from SAP administered by the New Jersey Division of Youth and Family Services (DYFS). B.H. also reported that her adopted daughter had part-time employment.

Initially, the local county welfare agency found B.H. eligible for continuing WFNJ/TANF benefits. In June 2006, DFD issued Instruction No. 06–6–4. It declared that a WFNJ/TANF grant could not be provided for a child receiving a DYFS grant during the same period. The instruction noted that "an eligible child

---

[2] WFNJ/TANF encompasses families with children, while WFNJ General Assistance encompasses single adults and couples without children. *N.J.A.C.* 10:90–1.1(b).

[3] *N.J.S.A.* 44:10–34 to –43, *N.J.S.A.* 44:10–44 to –54, and *N.J.S.A.* 44:10–71 to –78 were enacted as additional welfare reforms and to establish the WFNJ program.

cannot be included in the WFNJ/TANF cash payment for any month in which he or she receives a DYFS grant." The DFD explained as follows:

> *N.J.A.C.* 10:90–3.19(a) provides that grants provided through DYFS such as DYFS Kinship Program payments, monies received through the DYFS [SAP], and monies received on behalf of a foster child are exempt as income in the calculation of the TANF grant. However, there must not be any duplication between such aid and the public assistance grant.

Pursuant to this instruction, the local county welfare agency notified B.H. that her WFNJ/TANF assistance would be terminated effective July 1, 2006. According to the notice, B.H.'s WFNJ/TANF benefits were terminated because her unearned income exceeded the maximum benefit payment level. B.H.'s total unearned income was listed as $0. The local agency further noted that the adverse action was taken in accordance with *N.J.A.C.* 10:90–3.1.

Thereafter, B.H. requested a hearing, and the matter was transmitted to the Office of Administrative Law. The initial decision issued by the administrative law judge (ALJ) found that DFD Instruction No. 06–6–4 and the county welfare agency's decision to terminate previously approved benefits "constitutes a material and significant change from [DFD's] prior position," because *N.J.A.C.* 10:90–3.19(a)15vii specifically exempts SAP benefits. Accordingly, the ALJ held that DFD was required to adopt a rule reflecting this change.

In its final agency decision dated December 18, 2006, DFD rejected the ALJ's conclusion. DFD characterized Instruction No. 06–6–4 as "clarification and guidance in implementing an existing policy." DFD explained further that "[t]here must be no duplication between such aid and the WFNJ grant." Thus, the Director found that B.H.'s "children's DYFS subsidies exceed the amount of the assistance unit's WFNJ/TANF limit" and that Burlington County properly terminated B.H.'s WFNJ/TANF eligibility pursuant to *N.J.A.C.* 10:90–2.7(a) and –3.19(a)15.

Since 1959, New Jersey has engaged in a cooperative effort with the federal government to provide aid to families in need of

assistance. *Sojourner A. v. N.J. Dep't of Human Servs.*, 177 *N.J.* 318, 326, 828 *A.*2d 306 (2003). In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). *Pub.L. No.* 104–193, 110 *Stat.* 2105 (codified as amended in scattered sections of 42 *U.S.C.A.*); *M.F. v. Dep't of Human Servs., Div. of Family Dev.*, 395 *N.J.Super.* 18, 25, 928 *A.*2d 71 (App.Div.2007). The PRWORA replaced the Aid to Families with Dependent Children program with TANF. *M.F.,* *supra,* 395 *N.J.Super.* at 25, 928 *A.*2d 71 42 *U.S.C.A.* §§ 601–608; 45 *C.F.R.* §§ 260.10–260.40.

TANF is a block grant program which provides the states with the flexibility to implement welfare reform in their jurisdictions. *Sojourner, supra,* 177 *N.J.* at 326, 828 *A.*2d 306. These welfare reforms are subject to a mandatory national welfare-to-work feature, which is designed to motivate welfare recipients to become self-sufficient. *Id.* at 326–27, 828 *A.*2d 306. Two of the purposes of TANF are State implementation of programs designed to "provide assistance to needy families so that children may be cared for in their own homes" and cessation of "the dependence of needy parents on government benefits by promoting job preparation, work, and marriage." 42 *U.S.C.A.* § 601(a)(1)-(2).

In response to the PRWORA, New Jersey enacted the WFNJ Act. *N.J.S.A.* 44:10–55 to –70; *Sojourner, supra,* 177 *N.J.* at 327, 828 *A.*2d 306. In its legislative findings and declarations, the WFNJ Act stated that "[w]orking individuals and families needing temporary assistance should have the transitional support necessary to obtain and keep a job in order to be able to avoid cycling back onto public assistance." *N.J.S.A.* 44:10–56c. Additionally the legislature declared:

> f. Personal and family security and stability, including the protection of children and vulnerable adults, are important to the establishment and maintenance of successful family life and childhood development . . .;
>
> . . . .
>
> h. The Work First New Jersey program established pursuant to this act incorporates and builds upon the fundamental concepts of the Family Development

Initiative established pursuant to P.L. 1991, c. 523 (C.44:10–19 et seq.) in a manner that is consistent with the federal program of temporary assistance for needy families, by establishing requirements for: time limits on cash assistance; the participation of recipients in work activities. . . .

[*N.J.S.A.* 44:10–56f, h.]

Therefore, "the primary purpose of WFNJ is to encourage employment, self-sufficiency and family stability." *Sojourner, supra,* 177 *N.J.* at 327, 828 *A.*2d 306. *See generally N.J.S.A.* 44:10–56; *N.J.A.C.* 10:90–1.1(c).

The WFNJ/TANF program is administered at the local level by the county welfare agencies pursuant to regulations and directives promulgated by DHS/DFD. *S.D. v. Dep't of Human Servs., Div. of Family Dev.,* 344 *N.J.Super.* 325, 328, 781 *A.*2d 1105 (App.Div. 2001). The WFNJ Act provides for cash assistance payments and the DHS Commissioner is required to establish regulations determining eligibility for benefits. *M.F., supra,* 395 *N.J.Super.* at 26–27, 928 *A.*2d 71; *N.J.S.A.* 44:10–59e. *N.J.S.A.* 44:10–59a provides that "benefits shall be provided only when other means of support and maintenance are not present to support the assistance unit." Moreover, benefits are meant to be temporary and their primary goal is to foster self-sufficiency. *N.J.S.A.* 44:10–59b; *see N.J.A.C.* 10:90–1.1(d) ("Assistance benefits provided under WFNJ are time-limited and considered a temporary cash subsidy to bridge the gap while individuals seek and obtain self-sufficiency").

■ DYFS is responsible for (1) providing care and custody for children so they may continue to live in their own homes, so far as practicable; (2) providing necessary welfare services as may be required by such children, so far as practicable, without assumption of custody; (3) encouraging the development of private and voluntary agencies qualified to provide welfare services for children to the end that the need of such services may be limited or reduced; and (4) providing permanency for each child placed outside his home by the division through return of the child to the child's own home or through adoption or alternative permanent placement. *N.J.S.A.* 30:4C–3. Accordingly, "DYFS is charged with the responsibility for providing, through a variety of pro-

grams, necessary resources and facilities for children whose needs cannot or are not being met by their families." *Div. of Youth & Family Servs. v. County of Middlesex*, 188 *N.J.Super.* 1, 2–3, 455 *A.*2d 1119 (App.Div.1982).

In 1973, the State enacted a program "to benefit hard-to-place children in resource family care at State expense by providing the stability and security of permanent homes." *N.J.S.A.* 30:4C–45. *See generally N.J.S.A.* 30:4C–45 to –49. It provides that DYFS will make payments to adoptive parents on behalf of a child placed for adoption by DYFS whenever the child is hard to place due to physical or mental condition, race, age, or membership in a sibling group. *N.J.S.A.* 30:4C–46; *N.J.A.C.* 10:121–1.2 to –1.3. The program encourages adoption when appropriate adoptive families are willing to adopt such hard-to-place children and the only impediment to the adoptions is the inadequate financial circumstances of the prospective adoptive families. *County of Middlesex, supra,* 188 *N.J.Super.* at 3, 455 *A.*2d 1119.

*N.J.S.A.* 30:4C–47 outlines the scope of the payments; it provides that:

> Payments in subsidization of adoption shall include but are not limited to the maintenance costs, medical and surgical expenses, and other costs incidental to the care, training and education of the child. Such payments may not exceed the cost of providing comparable assistance in resource family care. . . .

*See N.J.A.C.* 10:121–1.4(b). It further provides that qualification for subsidized adoption payments may be redetermined annually and DYFS shall make all necessary rules and regulations for administering the program. *N.J.S.A.* 30:4C–48 to –49; *N.J.A.C.* 10:121–1.3(b).

*N.J.A.C.* 10:121–1.2 delineates a variety of circumstances under which a child could be considered a special needs child. These circumstances include, but are not limited to, a medical condition that will require frequent hospitalization or treatment, *N.J.A.C.* 10:121–1.2(a)9; a physical handicap, injury or disease that renders a child partially or totally incapacitated for education or "remunerative occupation," *N.J.A.C.* 10:121–1.2(a)2; or age, *N.J.A.C.*

10:121–1.2(a)6. In addition, SAP payments will not be made unless a child is placed for adoption by DYFS or is placed for adoption with a family in this State by an agency approved to provide adoption services in this State. *N.J.A.C.* 10:121–1.3(d)1–2. Title IV–E eligibility and SSI eligibility are identified as factors that may affect whether a child qualifies for an adoption subsidy. *N.J.A.C.* 10:121–1.3(d)3–5.

Payments under SAP are to be made pursuant to a written agreement, which shall include "[t]he additional assistance or services to be provided by the State, and how the costs for these items are to be met." *N.J.A.C.* 10:121–1.3(f)6. The written agreement covering the SAP payments "shall remain in effect regardless of family income until the child's 18th birthday." *N.J.A.C.* 10:121–1.4(a); *see N.J.A.C.* 10:121–1.4(d) ("An adoptive parent cannot be disqualified from receiving the subsidy because of his or her family income.").

An eligible assistance unit for WFNJ/TANF benefits is comprised of individuals who reside together and function as an economic unit and whose "relationship is based upon a blood and/or legal relationship. . . . The eligible WFNJ/TANF assistance unit includes the parent(s), parent person(s) or legal guardian . . . and [their] children up to the age of 18. . . ." *N.J.A.C.* 10:90–2.7(a)1. SSI recipients, illegal aliens and convicted drug felons may not be part of an assistance unit. *N.J.A.C.* 10:90–2.8(a)2, 3, 8.

The regulations recognize that the assistance unit may have several sources of income. *N.J.A.C.* 10:90–3.9. Maximum income levels have been set for each assistance unit by size. *N.J.A.C.* 10:90–3.3. Income is either countable or exempt. *N.J.A.C.* 10:90–3.9(a). "Exempt income is not considered in determining eligibility for assistance or in computing the amount of WFNJ cash assistance payments." *N.J.A.C.* 10:90–3.19(a). Exempt income includes SSI benefits for WFNJ/TANF and Kinship Subsidy Program payments. *N.J.A.C.* 10:90–3.19(a)10, 12. It also includes "[m]onies received through the Subsidized Adoption Program of

the Division of Youth and Family Services pursuant to *N.J.S.A.* 30:4C–45 through 49." *N.J.A.C.* 10:90–3.19(a)15vii. These monies are also identified as exempt resources designated for special purposes by *N.J.A.C.* 10:90–3.20(a)14vii. In addition to the specific provision referring to SAP benefits, *N.J.A.C.* 10:90–3.19(a)15vi lists the following as exempt income:

> Supplemental aid by other agencies or organizations, whether public or private, provided that:
>
>> (1) There is no duplication between such aid and the public assistance grant;
>>
>> (2) Such aid is for a special purpose not within the function of the public assistance agency (for example, vocational rehabilitation); or
>>
>> (3) Such aid is to any undergraduate student for educational purposes.

*See N.J.A.C.* 10:90–3.20(a)14vi.

In her decision, the program director found that the SAP grant from DYFS and the WFNJ/TANF grant were duplicative. In support of this decision, the director cited *N.J.A.C.* 10:90–2.7(a) and –3.19(a)15. As noted, *N.J.A.C.* 10:90–2.7(a) identifies who may and may not be part of an assistance unit. This rule does not address receipt of SAP or other DYFS benefits. *N.J.A.C.* 10:90–3.19(a)15vi addresses supplemental aid from other public or private agencies. This type of income is exempt unless it is duplicative of the public assistance grant. *N.J.A.C.* 10:9–3.19(a)15vi(1). The director also referenced DFD Instruction No. 06–6–4, noting that the intent of the instruction was only to provide clarification and guidance in the implementation of existing policy.

B.H. argues that the DFD instruction is inoperative because it effects a clear and substantial change to existing DFD regulations without utilizing the administrative rule adoption procedure of the APA. Therefore, B.H. contends that even if the DFD was correct in determining that SAP and WFNJ/TANF benefits are duplicative, the final decision must be set aside.

An administrative rule means "each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." *N.J.S.A.* 52:14B–2(e).

The term does not include "(2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases." *Ibid.* However, "[t]he APA itself recognizes that an agency action or determination 'that implements or interprets law or policy' can constitute an 'administrative rule.'" *Metromedia, Inc. v. Dir., Div. of Taxation,* 97 *N.J.* 313, 330, 478 *A.*2d 742 (1984) (quoting *N.J.S.A.* 52:14B–2(e)). An agency determination may be considered a "rule" for APA purposes if it "effects a material change in existing law" or alters the status quo. *Ibid.* Thus, an administrative rule may encompass the issuance of an agency "instruction" or an adjudication of a particular person's case if it contains the characteristics of a rule.

The Court in *Metromedia* held that an agency action should be considered an administrative rule when all or most of the relevant features of an administrative rule are present. *Id.* at 331, 478 *A.*2d 742. Therefore, an administrative rule is usually present when the determination or instruction

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Id.* at 331–32, 478 *A.*2d 742.]

Often an agency determination may be a hybrid "partaking of both the rule-making and the adjudicatory mode." *Id.* at 332, 478 *A.*2d 742. Furthermore, "[i]f the several relevant features that typify administrative rules and rule-making weigh in favor of action that is quasi-legislative in character, rather than quasi-judicial or adjudicatory, that balance should determine the procedural steps required to validate the ultimate agency action." *Ibid.*

■ The DFD argues that its instruction only serves as an informal intra-agency document designed to clarify existing policy. "Intra-agency statement" is not defined in the APA. In *Woodland Private Study Group v. New Jersey Department of Environmental Protection*, 109 *N.J.* 62, 75, 533 *A*.2d 387 (1987), the Court defined an intra-agency statement as "(1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public." The appropriate inquiry of whether an action is exempt as an intra-agency statement is "whether the agency action has a 'substantial impact' on the rights or interests of the parties." *Id.* at 74, 533 *A*.2d 387.

■ The standard adopted in *Woodland* is the same that has been adopted by the federal courts. *Ibid.* Federal courts have noted that the intra-agency exemption covers actions " 'that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.' " *Id.* at 70, 533 *A*.2d 387 (quoting *Batterton v. Marshall*, 648 *F*.2d 694, 707–08 (D.C.Cir.1980)). In short, the intra-agency statement exemption does not apply when the agency action trenches on substantial private rights and interests, such as modification of approval procedures for a specific benefit. *Id.* at 71, 533 *A*.2d 387.

Here, the DFD instruction more closely resembles an administrative rule rather than an intra-agency statement. The DFD instruction has wide coverage, as it applies to all recipients of both SAP and WFNJ/TANF benefits. The policy was not explicitly expressed previously. Indeed, it is contrary to the DFD's previous approval of B.H. for WFNJ/TANF benefits, despite her receipt of SAP benefits. *See Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot.*, 191 *N.J.* 38, 54–55, 921 *A*.2d 1122 (2007) (finding administrative rule making where a statement of an administrative position was enforced, which had not previously been expressed and which constituted a material change from a clear, past agency position on the subject).

Instruction No. 06–6–4 is very similar to the situation in *Metromedia, supra,* in which the Division of Taxation Director commenced use of a method of tax calculation that had not been previously utilized. 97 *N.J.* at 319–20, 337, 478 *A.*2d 742. Although the method was not prohibited by the agency's regulations, its application represented a material change from the Division's past procedures and, thus, constituted rule making. *Id.* at 332–37, 478 *A.*2d 742.

Additionally, in *Maticka v. City of Atlantic City,* 216 *N.J.Super.* 434, 456, 524 *A.*2d 416 (App.Div.1987), we held that an agency instruction similar to the DFD instruction before this court required rule-making procedures. In *Maticka,* an agency instruction was issued that defined a term contained within the agency's regulations. *Id.* at 438, 524 *A.*2d 416. The agency claimed that the instruction purportedly codified a long-standing policy. *Ibid.* This court held that further interpretation of the regulation with the intention to bind the administration of emergency assistance throughout the State can only be effectuated through formal rule making. *Id.* at 452–53, 524 *A.*2d 416.

The change advanced by DFD Instruction No. 06–6–4 is not merely an internal instruction that imposes a procedure an agency must follow in implementing its regulations or that reiterates a policy already in place. *See, e.g., Bullet Hole, Inc. v. Dunbar,* 335 *N.J.Super.* 562, 583–84, 763 *A.*2d 295 (App.Div.2000) (finding that charging a fee for the processing of criminal history as required by regulation is not rule making, in part, because it does not embody a detailed set of eligibility requirements). The change substantially impacts the right of B.H. and others to receive public assistance.

Although we have not been asked by B.H. to hold that SAP benefits are not duplicative, the instruction changes, rather than interprets, existing regulations. That is, the instruction effectively amends the existing regulation. *N.J.A.C.* 10:90–3.19(a)15 lists the various sources of income that are exempt or non-countable. SAP benefits are expressly enumerated as exempt income. *N.J.A.C.*

10:90–19(a)15vii. Notably, only "[s]upplemental aid by other agencies or organizations, whether public or private" may lose its exemption because it duplicates the aid received from the public assistance grant. *N.J.A.C.* 10:90–3.19(a)15vi(1). The effect of the instruction is to conflate SAP grants and other specifically identified grants with the supplemental aid referenced in *N.J.A.C.* 10:90–3.19(a)15vi. This is an alteration of the plain language of the regulation that is meant to have uniform applicability throughout the State. Such an alteration may not be effected by an instruction. Such an alteration is subject to the formal rulemaking provision of the APA and cannot form the basis to deny B.H. the benefits for which she applied.

Reversed.